Consolidated Case Nos. 26-9515 and 26-9516

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

STATE OF COLORADO,
*Petitioner*, and

NATIONAL PARKS CONSERVATION ASSOCIATION
and SIERRA CLUB,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN,
in his official capacity as U.S. Environmental Protection
Agency Administrator,

*Respondents*, and

COLORADO SPRINGS UTILITIES,

*Respondent-Intervenor*.

---

Petition for Review
of U.S. Environmental Protection Agency Rulemaking

---

**PETITIONERS NATIONAL PARKS CONSERVATION ASSOCIATION AND SIERRA CLUB'S FINAL REPLY BRIEF (DEFERRED APPENDIX PROCEEDING)**

**ORAL ARGUMENT REQUESTED**

---

Michael Hiatt
Ameya Gehi
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
(303) 623-9466
mhiatt@earthjustice.org
agehi@earthjustice.org

*Attorneys for National Parks Conservation Association and Sierra Club*

Matthew Gerhart
Sierra Club
1536 Wynkoop St., Suite 200
Denver, CO 80202
(303) 454-3346
matt.gerhart@sierraclub.org

*Attorney for Sierra Club*

September 25, 2026

## TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. NPCA and Sierra Club have standing .......... 3

II. EPA arbitrarily disapproved Colorado's entire regional haze SIP .......... 13

III. EPA arbitrarily disapproved the SIP's Nixon retirement deadline on necessary assurances grounds .......... 18

- A. EPA arbitrarily dismissed Colorado's assurances .......... 20
- B. EPA's decision creates a loophole in the regional haze program .......... 23
- C. EPA improperly based its disapproval solely on CSU's post hoc statements retracting its previous commitment to retire Nixon in 2029 .......... 25
- D. EPA arbitrarily dismissed Colorado's reliance interest on EPA's 2019 Guidance .......... 26
- E. The Court should give no weight to statements suggesting the Nixon retirement would create grid reliability issues and Colorado should treat Nixon similar to the Comanche retirement .......... 27

IV. The Court should vacate EPA's rule .......... 30

CONCLUSION .......... 33

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Action, Inc. v. Donovan*,
789 F.2d 1453 (10th Cir. 1986) ........................................................ 15

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ........................................................ 15

*Ascendium Educ. Sols., Inc. v. Cardona*,
78 F.4th 470 (D.C. Cir. 2023) ........................................................ 12

*Ass'n of Irritated Residents v. EPA*,
790 F.3d 934 (9th Cir. 2015) ........................................................ 9

*Biodiversity Conservation All. v. Jiron*,
762 F.3d 1036 (10th Cir. 2014) ........................................ 17, 23-24

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ........................................................ 21

*Kentucky v. EPA*,
123 F.4th 447 (6th Cir. 2024) ........................................................ 27

*Lewis v. Tripp*,
604 F.3d 1221 (10th Cir. 2010) ........................................................ 13

*New York v. EPA*,
964 F.3d 1214 (D.C. Cir. 2020) ........................................................ 22

*NPCA v. Tenn. Valley Auth.*,
No. 3:01-cv-71 (E.D. Tenn.) ........................................................ 10

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ........................................................ 18

*Safe Air For Everyone v. EPA*,
488 F.3d 1088 (9th Cir. 2007) ........................................................ 11

*Sierra Club v. EPA*,
60 F.4th 1008 (6th Cir. 2023) ........................................................ 9, 10

*Sierra Club v. EPA*,
671 F.3d 955 (9th Cir. 2012)............................................................. 26

*Sierra Club v. EPA*,
793 F.3d 656 (6th Cir. 2015)............................................................. 13

*Sierra Club v. EPA*,
964 F.3d 882 (10th Cir. 2020)............................................................. 7

*US Magnesium, LLC v. EPA*,
690 F.3d 1157 (10th Cir. 2012)........................................................ 6, 9

*Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*,
21 F.4th 1229 (10th Cir. 2021) ....................................................... 4, 10

*Utah v. Evans*,
536 U.S. 452 (2002)............................................................................. 7

*WildEarth Guardians v. EPA*,
759 F.3d 1196 (10th Cir. 2014).........................................................7, 9

*WildEarth Guardians v. Mountain Coal Co.*,
No. 20-cv-01342-RM-STV (D. Colo.) ................................................... 10

**Statutes**

42 U.S.C. § 7410 ..................................................................................... 11

42 U.S.C. § 7410(c)(1)(B) ........................................................................ 6, 7

42 U.S.C. § 7491 ................................................................................... 9, 11

42 U.S.C. § 7604(a)(1)................................................................................. 9

Colo. Rev. Stat. § 25-7-105(1)(a)(I)............................................................ 7

Colo Rev. Stat. § 25-7-105(1)(e)(VIII.5)(I)............................................... 32

Colo Rev. Stat. § 25-7-105(1)(e)(XI.1), (1)(e)(XI.2)................................. 32

Colo. Rev. Stat. § 25-12-104 .......... 10
Colo. Rev. Stat. § 34-60-114 .......... 10

**Other Authorities**

40 CFR 51.308(f)(5) .......... 16
40 CFR 51.308(f)(6) .......... 16
89 Fed. Reg. 55140, 55161 (July 3, 2024) .......... 11
90 Fed. Reg. 31926, 31934–37 (July 16, 2025) .......... 5
90 Fed. Reg. at 31931–43 .......... 14
90 Fed. Reg. at 31932, 31940-43 .......... 15
90 Fed. Reg. at 31933 .......... 5
90 Fed. Reg. at 31938 .......... 22
90 Fed. Reg. at 31941 .......... 9
90 Fed. Reg. at 31942 .......... 16
91 Fed. Reg. 3048, 3056 (Jan. 26, 2026) .......... 8
91 Fed. Reg. at 3049 .......... 14, 21
91 Fed. Reg. at 3050–51 .......... 21
91 Fed. Reg. at 3050–56 .......... 15
91 Fed. Reg. at 3052 .......... 29
91 Fed. Reg. 7204, 7217 & n.81 (Feb. 17, 2026) .......... 24
91 Fed. Reg. 34589, 34592 (June 8, 2026) .......... 24

## GLOSSARY

| | |
|---|---|
| CSU | Colorado Springs Utilities |
| EPA | United States Environmental Protection Agency |
| NPCA | National Parks Conservation Association |
| SIP | State Implementation Plan |
| tpy | Tons Per Year |

## INTRODUCTION

Colorado's regional haze State Implementation Plan (SIP) is a comprehensive plan to reduce air pollution and improve visibility at national parks and wilderness areas, such as Rocky Mountain National Park. Colorado's SIP includes emission limits for fourteen industrial facilities, retirement deadlines for several power plants, and other required SIP elements to monitor and improve visibility. The U.S. Environmental Protection Agency (EPA) arbitrarily and capriciously disapproved Colorado's entire SIP based on its concern that the retirement deadline for one facility—the Nixon power plant—might violate the Takings Clause.

The first error in EPA's rule is that EPA arbitrarily and capriciously disapproved Colorado's entire SIP. Much of the focus in this case is on Nixon, and EPA's final rule and its brief do not even mention many of the other sources and SIP elements that EPA swept into its disapproval. But the Court should not lose sight of the fact that Nixon is just one component of a much larger plan, all of which EPA disapproved. EPA argues its decision was permissible because it has discretion to fully or partially disapprove a SIP. But EPA must

rationally exercise that discretion. EPA failed to do so here when it initially proposed to approve the majority of the SIP but then reversed course and disapproved the entire SIP with a cursory and inadequate explanation.

The second error in EPA's rule is that EPA arbitrarily and capriciously disapproved the 2029 Nixon retirement on necessary assurances grounds. EPA repeatedly claims this case is novel and unprecedented because Colorado is using its SIP to force Nixon to close against Colorado Springs Utilities' (CSU) wishes. But this mischaracterizes the SIP. Colorado included the Nixon retirement in the SIP at CSU's express request and in accordance with EPA guidance and past practice. If there is anything novel and unprecedented here, it is that EPA disapproved Colorado's entire SIP based on nothing more than CSU's belated and unsubstantiated claims that it no longer agreed to retire Nixon by the date it originally requested, thereby allowing CSU to opt out of its regional haze obligations. EPA insists that Colorado failed to provide necessary assurances. But Colorado did just that in its September 2025 comments explaining why the Nixon retirement would not result in a taking. Yet EPA arbitrarily and

capriciously rejected those assurances. It is telling that CSU has not raised any takings concerns with the SIP and it takes no position on EPA's necessary assurances argument.

Additionally, National Parks Conservation Association (NPCA) and Sierra Club have standing to challenge EPA's rule. EPA claims its disapproval does not cause NPCA's and Sierra Club's members' harm because the SIP requirements remain in state law. However, EPA overlooks the impacts of its SIP disapproval, which will likely result in a weaker regional haze plan if Colorado revises its SIP or EPA issues a federal plan. Also, the lack of federal enforceability injures the members because they lose the ability to bring federal citizen suits and the procedural protections that result from the SIP becoming federal law.

## ARGUMENT

### I. NPCA and Sierra Club have standing

The numerous power plants and industrial facilities regulated by Colorado's SIP emit pollution that harms NPCA's and Sierra Club's members. The SIP will limit and reduce the pollution emitted by these sources, which will benefit the members. EPA disapproved the SIP, thereby disapproving the emission limits, retirement deadlines, and

other elements that would benefit the members. A favorable decision by this Court would benefit the members and redress these injuries by setting aside EPA's disapproval and requiring EPA to reconsider its unlawful decision. NPCA and Sierra Club therefore have standing to challenge EPA's decision. NPCA and Sierra Club Opening Br. at 19–22 (ECF No. 33) [hereinafter "Opening Br."].[1]

EPA argues that NPCA and Sierra Club do not have standing because its SIP disapproval did not cause the members' injuries and a favorable decision would not redress the injuries. EPA Br. at 25 (ECF No. 61). The Court should reject EPA's arguments for several reasons.

First, EPA briefly suggests that the injuries suffered by NPCA's and Sierra Club's members may be "non-concrete." *Id.* at 26. Setting aside that EPA makes this suggestion in passing and without any analytical support, this Court has held that health and recreational injuries from increased air pollution are concrete injuries. *See, e.g.*, *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021). If EPA approved the SIP, the power plants

[1] The citations in this brief cite to the page numbers in the parties' preliminary briefs.

and industrial facilities regulated by the SIP would have federally enforceable obligations to reduce their visibility-impairing pollution by 35,238 tons per year (tpy), collectively. 90 Fed. Reg. 31926, 31934–37 (July 16, 2025); App. at 00583-585 (EPA-R08-OAR-2024-0607-0015, Doc. 26 at 152–54). For example, the SIP would reduce the Suncor refinery's emissions by 101 tpy. App. at 00583-585 (EPA-R08-OAR-2024-0607-0015, Doc. 26 at 152–54). Suncor is one of the top five sources that impairs visibility at Rocky Mountain National Park, and the SIP's pollution reductions will benefit NPCA's and Sierra Club's members who regularly visit the park. 90 Fed. Reg. at 31933; Coppola Decl. ¶ 26 tbl.1 (ECF No. 34-4); Douglas Decl. ¶ 6 (ECF No. 34-5); McDonagh Decl. ¶ 6 (ECF No. 34-6). In addition, the SIP would reduce Nixon's emissions by 1,442 tpy, and Nixon is one of the top ten sources that impairs visibility at Great Sand Dunes National Park, which NPCA and Sierra Club members regularly visit. 90 Fed. Reg. at 31933; App. at 00583-585 (EPA-R08-OAR-2024-0607-0015, Doc. 26 at 152–54); Coppola Decl. ¶ 26 tbl.2; Elsbeth Atencio Decl. ¶ 5 (ECF No. 34-2); Ernest Atencio Decl. ¶ 6 (ECF No. 34-3). EPA's final rule disapproving the SIP's emission reductions for Suncor (as well as the other industrial

facilities) and the retirement deadline for Nixon (and the other power plants) concretely harms NPCA's and Sierra Club's members.

Second, EPA argues that its disapproval is not the cause of the members' injuries, and that a favorable decision would not redress their injuries because the SIP's emission limits and retirement deadlines remain in state law regardless of EPA's disapproval. EPA Br. at 26–27. EPA cites no case law to support this argument, and the Court should reject it. EPA's argument rests on the erroneous assumption that this case would not "alter" state law. *Id.* at 26–27. But EPA overlooks how its disapproval triggered a requirement that Colorado and/or EPA take additional actions that will likely result in a weaker regional haze plan that includes less pollution reductions than the SIP. 42 U.S.C. § 7410(c)(1)(B).

A petitioner has standing to challenge an EPA rule requiring a SIP revision if the subsequent revision will likely protect the petitioner's interest less than the original SIP. *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1166–67 (10th Cir. 2012). To establish standing in this context, petitioners must show that EPA's rule "significantly affects" the state's subsequent decision-making process and that a court

decision overturning the rule "would significantly increase the chances of" a result that is favorable to the petitioner. *Id.* at 1167; *see also Utah v. Evans*, 536 U.S. 452, 464 (2002) (a "significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury" suffices for redressability); *Sierra Club v. EPA*, 964 F.3d 882, 890 (10th Cir. 2020) ("[T]he potential for further improvement [in air quality] satisfies the requirement of redressability."); *WildEarth Guardians v. EPA*, 759 F.3d 1196, 1206–07 (10th Cir. 2014) (same).

NPCA and Sierra Club have standing here because EPA's disapproval triggered a two-year statutory deadline for EPA to either approve a revised SIP or issue a federal plan—and that revised SIP or federal plan will likely result in less pollution reductions than the SIP at issue here. 42 U.S.C. § 7410(c)(1)(B); *see* Colo. Rev. Stat. § 25-7-105(1)(a)(I). For example, if Colorado revises its SIP, it could omit certain measures from the original SIP that would have reduced pollution that harms NPCA's and Sierra Club's members. Coppola Decl. ¶ 30; Ernest Atencio Decl. ¶ 13. EPA's statements suggest this outcome is likely, as EPA claims elsewhere in its brief that its disapproval "incentivizes" Colorado to revise its SIP and revisit the Nixon

retirement. EPA Br. at 45. Moreover, EPA claims that the SIP's power plant retirements risk violating federal or state law, so Colorado's revised SIP may remove certain elements of the existing SIP. *Id.* at 34. As an example, if Colorado were to remove the Nixon retirement deadline (or any of the other power plant retirement deadlines) from the SIP and instead require Nixon to install additional pollution controls, it would result in greater overall emissions than closing the plant and reducing its emissions to zero. *See, e.g.*, App. at 01893-tbl.8 (EPA-R08-OAR-2024-0607-0058, Ex. 43 at 42 tbl.8) (if CSU installed the most effective pollution controls, Nixon would still emit 0.03 lb/MMBtu of nitrogen oxides).

Another potential outcome of the disapproval is that EPA issues a federal plan that does not sufficiently reduce haze pollution, which would harm NPCA's and Sierra Club's members. This result is also likely if EPA issues a federal plan. Despite withdrawing its initial proposal to disapprove all the SIP's power plant retirement deadlines, EPA made it clear that it "does not encourage electric generating facilities to close in the face of [rising] energy demand." 91 Fed. Reg. 3048, 3056 (Jan. 26, 2026). EPA also found that no additional pollution

reductions would be necessary if Colorado removed the power plant retirements from the SIP. 90 Fed. Reg. at 31941. In sum, NPCA and Sierra Club have standing because EPA's disapproval "significantly affects" Colorado's and EPA's decisions on how to address haze pollution in this SIP, and setting aside EPA's rule "would significantly increase the chances" that there is a strong regional haze plan for Colorado with pollution reductions that benefit NPCA's and Sierra Club's members. *US Magnesium*, 690 F.3d at 1166–67.

EPA also ignores the importance of federal enforceability, and the lack of federal enforceability for Colorado's SIP causes a procedural injury. *Sierra Club v. EPA*, 60 F.4th 1008, 1017–20 (6th Cir. 2023); *Ass'n of Irritated Residents v. EPA*, 790 F.3d 934, 940 n.4 (9th Cir. 2015). Standing for procedural injuries is "somewhat relaxed, or at least conceptually expanded," and the fact that the requested relief "may" influence EPA's decision is sufficient. *WildEarth Guardians*, 759 F.3d at 1205. Here, federal enforceability matters because it provides NPCA and Sierra Club with the ability to enforce regional haze obligations in federal court. *See* 42 U.S.C. §§ 7604(a)(1), 7491. As this Court has explained, "[a]n approved SIP 'has the force and effect of federal law,'

and, like the [Clean Air Act] itself, can be enforced in federal court." *Utah Physicians*, 21 F.4th at 1237 (quoting *Espinosa v. Roswell Tower, Inc.*, 32 F.3d 491, 492 (10th Cir. 1994)). NPCA and Sierra Club use this tool, and they have filed Clean Air Act citizen suits to protect their members.[2] EPA's disapproval eliminates this federal enforceability even if the SIP provisions remain in state law.

Moreover, NPCA and Sierra Club cannot enforce the SIP in state court because Colorado law does not authorize private plaintiffs to enforce the SIP's requirements.[3] But even if it did, possible alternative remedies "do[] not deprive Petitioners of standing," and state lawsuits "are not a sufficient substitute for [Clean Air Act] citizen suits." *Sierra Club*, 60 F.4th at 1017, 1020.

Federal enforceability also matters because it promotes compliance and provides procedural protections that alleviate NPCA's and Sierra Club's members' injuries. For instance, when private citizens

[2] *E.g.*, *WildEarth Guardians v. Mountain Coal Co.*, No. 20-cv-01342-RM-STV (D. Colo.); *NPCA v. Tenn. Valley Auth.*, No. 3:01-cv-71 (E.D. Tenn.).

[3] Colorado law authorizes citizen suits in only limited circumstances, such as excessive noise and violations of oil and gas development standards. Colo. Rev. Stat. §§ 25-12-104, 34-60-114.

send notices of intent to sue, it can encourage compliance even if litigation does not result. *Id.* at 1018. In addition, once EPA approves a SIP it becomes "federal law" and cannot be changed "unless and until EPA approve[s] any change." *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1097 (9th Cir. 2007). The Clean Air Act also mandates that regional haze regulations be federally enforceable (either by a federal plan or approved SIP), not just codified in state law. 42 U.S.C. §§ 7410, 7491. So any SIP amendments would have to go "through the statutory SIP revision process," thereby making regional haze requirements more "permanent and enforceable." 89 Fed. Reg. 55140, 55161 (July 3, 2024). Thus, when EPA approves a SIP, the SIP's requirements become more difficult to adjust or remove due to this additional layer of regulatory review and approval.

Third, EPA argues that any injuries resulting from its disapproval of the 2029 Nixon retirement deadline are not redressable due to a recent Colorado law, which EPA claims sets a new 2032 retirement deadline for Nixon. EPA Br. at 27. EPA argues that due to this new law, NPCA's and Sierra Club's members' injuries are not redressable because EPA could not approve the 2029 closure on remand. *Id.* EPA is

wrong here for two reasons. The members' injuries flow from EPA's disapproval of the entire SIP. EPA used its Nixon disapproval as grounds for disapproving the entire SIP. But the harm caused by EPA's rule is not limited to its disapproval of the Nixon retirement deadline, as EPA also disapproved the emission limits for the industrial facilities and the retirement deadlines for the other power plants. NPCA and Sierra Club seek vacatur of EPA's action disapproving the entire SIP that would have reduced visibility-impairing pollution from several sources, which would redress the injuries. *See, e.g.*, *Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 478 (D.C. Cir. 2023) (plaintiffs have "standing to bring any claims that could lead to . . . vacatur").

In addition, EPA mischaracterizes the recent legislation. As discussed in the vacatur section below, the legislation does not codify a 2032 retirement deadline for Nixon. *Infra* at 31–32. Instead, the law merely provides a procedural path for CSU and Colorado to extend the 2029 deadline, which has not occurred yet. *Id.* EPA's definitive

statement on what it could not approve in the future is based on speculation.[4]

## II. EPA arbitrarily disapproved Colorado's entire regional haze SIP

The Court should set aside and vacate EPA's rule disapproving Colorado's SIP. The SIP is a detailed and comprehensive plan to reduce visibility-impairing air pollution. The SIP includes (1) emission limits for over seventy emission units at fourteen industrial facilities, such as the Suncor oil refinery and the EVRAZ steel mill; (2) retirement deadlines for several coal- and gas-fired power plants and a coal mine; and (3) numerous other elements, including a long-term strategy to improve visibility, reasonable progress goals to ensure continued

[4] EPA briefly argues that the standing declarations do not "aver[] that EPA's disapproval caused [their] injuries." EPA Br. at 26. This argument misses the mark. Standing declarants' role is to provide underlying facts of injury, traceability, and redressability that would allow a court to reasonably infer that standing exists. *See, e.g.*, *Sierra Club v. EPA*, 793 F.3d 656, 664 (6th Cir. 2015); *Lewis v. Tripp*, 604 F.3d 1221, 1224 n.1 (10th Cir. 2010). The members' declarations here meet this standard, as NPCA and Sierra Club members expressly discuss EPA's contribution to their injuries and how vacatur would redress them. Elsbeth Atencio Decl. ¶ 12; Ernest Atencio Decl. ¶ 13; Coppola Decl. ¶ 30; Everett Decl. ¶ 18 (ECF No. 34-7).

improvement in visibility, and a monitoring strategy. 90 Fed. Reg. at 31931–43.

EPA's sole basis for disapproving the SIP was the purportedly unconsented Nixon retirement. 91 Fed. Reg. at 3049. EPA did not explain why the alleged flaws with Nixon warranted disapproval of the emission limits for the other industrial sources, the retirement deadlines for the other power plants, and every other SIP element. Opening Br. at 28–33. EPA also failed to respond to significant comments explaining that it would be arbitrary and capricious for EPA to disapprove voluntary retirement deadlines for power plants other than Nixon. *Id.* at 34–39. Consequently, even if the Court upholds EPA's disapproval of the Nixon retirement deadline, it should set aside EPA's disapproval of the other SIP elements.

EPA argues that it properly disapproved the entire SIP because it has discretion to fully or partially disapprove a SIP under Clean Air Act section 110(k)(3), and the Act does not require it to approve every SIP element that is approvable. EPA Br. at 40–42. But the issue here is not whether section 110(k)(3) provides EPA with discretion to fully or partially disapprove a SIP. Instead, the issue is whether EPA rationally

exercised that discretion and adequately explained its decision based on the facts of this case. *See, e.g.*, *Action, Inc. v. Donovan*, 789 F.2d 1453, 1459 (10th Cir. 1986) (Where an agency has discretion, it must still "explain its decision.").

EPA failed to rationally exercise its discretion. EPA originally proposed to *approve* the SIP's 70+ emission limits and most of the other SIP elements, determining that those limits and elements comply with the Clean Air Act. 90 Fed. Reg. at 31932, 31940–43. EPA therefore had to rationally explain in the final rule why it changed its position on approving most of the SIP. This required more than EPA citing its discretion to fully disapprove a SIP. *See, e.g.*, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("At bottom, an agency must explain 'why it chose to do what it did.'" (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001))).

Notably, EPA did not explain why it reversed course on the many SIP elements that it initially analyzed and found to be compliant with its regional haze regulations. *See* 91 Fed. Reg. at 3050–56. For example, EPA did not explain in the final rule why it believed that the emission limits for the Suncor refinery and the EVRAZ steel mill—which it

proposed to approve—now required disapproval. *Id.* EPA also did not explain why it no longer believed that the SIP's "monitoring strategy . . . me[t] the requirements of 40 CFR 51.308(f)(6)," or why it changed its position that "Colorado has met the progress report requirements of 40 CFR 51.308(f)(5)." 90 Fed. Reg. at 31942. Tellingly, neither the Federal Register notice for the final rule nor EPA's brief even mention the Suncor refinery, the EVRAZ steel mill, and the other industrial facilities with emission limits that EPA disapproved.

There is also no rational basis for EPA's full SIP disapproval. EPA concluded that the Nixon retirement deadline and the long-term strategy including that retirement were unapprovable, but that conclusion does not warrant disapproval of the other SIP elements. For example, even assuming that the Nixon determination and the long-term strategy were flawed, that does not provide a basis to disapprove the SIP's monitoring strategy, the progress report, and the other SIP elements, as these elements are entirely separate from the Nixon retirement.

In an attempt to bolster its decision, EPA claims in its brief that its full disapproval was consistent with EPA's longstanding position on

disapproving SIPs and that the final rule explained the "benefits that a full disapproval would have for the [SIP] revision process moving forward," including allowing Colorado to "further assess the energy impacts of the Nixon closure." EPA Br. at 41. The Court should reject these post hoc rationalizations. *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) (Courts should not "accept appellate counsel's post-hoc rationalizations for agency action"). Contrary to EPA's claim, the agency did not provide either of these rationales for full disapproval in the final rule. The portion of the final rule cited by EPA discusses why EPA withdrew its initial determination that Colorado did not adequately consider the energy and grid impacts of the power plant retirements. EPA Br. at 41 (citing 91 Fed. Reg. at 3056/1). EPA did not state in this passage that a full SIP disapproval would provide the benefit of allowing Colorado to further assess the Nixon closure's energy impacts—and that passage does not even mention Nixon. Moreover, even if it were permissible, EPA's post hoc rationalization itself is irrational and arbitrary. It was unnecessary for EPA to disapprove every SIP element for Colorado to further assess the

Nixon closure. The partial SIP disapproval that EPA initially proposed would achieve that result.

Finally, EPA offers no substantive response to NPCA and Sierra Club's argument that EPA failed to respond to significant comments regarding its disapproval of the voluntary retirement deadlines for the power plants other than Nixon. Opening Br. at 34–39. EPA simply repeats its argument that it has discretion to fully disapprove a SIP, and it claims this explanation "sufficed for responding to these comments as well." EPA Br. at 42. The Court should reject this half-hearted defense and rule that EPA did not comply with its obligation to respond to significant comments challenging a fundamental premise of its rule. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

## III. EPA arbitrarily disapproved the SIP's Nixon retirement deadline on necessary assurances grounds

The Court should set aside and vacate EPA's rule disapproving the Nixon retirement deadline because EPA unreasonably concluded that Colorado failed to provide necessary assurances under Clean Air Act section 110(a)(2)(E)(i). EPA clarified in its brief that the Act did not require Colorado to provide necessary assurances regarding the Takings Clause when it submitted the SIP in 2022, as the Nixon retirement was

voluntary at that time. EPA Br. at 35. According to EPA, that obligation only arose after CSU changed its position regarding Nixon. *Id.* Consequently, the issue here is whether EPA reasonably concluded that Colorado failed to provide necessary assurances after CSU reversed course on the Nixon retirement in 2025. While EPA and Colorado raise statutory interpretation arguments regarding the Act's necessary assurances provision, the Court does not need to resolve those statutory interpretation questions. *See id.* at 27–33. EPA's decision was arbitrary and capricious for several separate and independent reasons, regardless of whether its necessary assurances interpretation is the best reading of the statute.

The Court should also dismiss EPA's repeated claim that this case is novel and unprecedented because "no state has ever used an approved state plan to force a power plant to close against its operator's wishes." *Id.* at 1; *see also id.* at 17, 33–34, 36. Colorado's SIP does not foist an unconsented closure on CSU. Instead, the SIP includes a 2029 Nixon retirement deadline that CSU expressly agreed to when Colorado developed and submitted its SIP. App. at 00490, 00504-506 (EPA-R08-OAR-2024-0607-0015, Doc. 26 at 59, 73–75). In its brief, CSU does not

dispute that it initially agreed to the 2029 retirement or that this retirement commitment allowed Nixon to avoid installing additional pollution controls during the second implementation period. *See* CSU Resp. Br. at 4–6 (ECF No. 64) (hereinafter "CSU Br."); Opening Br. at 8–15. Moreover, while it suggests a forced closure is problematic, EPA expressly withdrew its initial finding with regard to Colorado's SIP that the Clean Air Act does not authorize forced closures. App. at 02048 (EPA-R08-OAR-2024-0607-0069 at 23).

### A. EPA arbitrarily dismissed Colorado's assurances

The Court should set aside EPA's decision because Colorado provided the necessary assurances sought by EPA, yet EPA arbitrarily dismissed those assurances. Opening Br. at 50–53. After EPA informed Colorado that it must provide necessary assurances for Nixon, Colorado submitted detailed comments to EPA in September 2025 explaining why including the Nixon retirement in the SIP would not run afoul of the Takings Clause. App. at 01937-1947 (EPA-R08-OAR-2024-0607-0059 at 25–35). Colorado therefore timely provided the assurances that EPA claimed were necessary.

EPA, however, dismissed Colorado's assurances. EPA disagreed with Colorado's takings analysis, and it stated that it "need not and cannot simply defer to the State's position." 91 Fed. Reg. at 3049. But at the same time, EPA also stated it was not making any substantive decision about whether the Nixon retirement would result in a taking. *Id.* at 3050–51. In its brief, EPA claims Colorado's comments explaining why there would not be a taking answered "the wrong question." EPA Br. at 37. According to EPA, it "did not adjudicate whether forcing a power plant to close is a taking [and] [i]nstead, EPA asked only whether Colorado had provided necessary assurances that an involuntary closure would not be an illegal taking." *Id.*

The answer to this question of whether Colorado provided necessary assurances is "yes," and EPA's decision rejecting those assurances is arbitrary and capricious. Nowhere in the final rule or its brief does EPA explain why Colorado's assurances were insufficient. EPA only stated that it need not defer to Colorado's position, while it also expressly took no position on whether the SIP would result in a taking. *See, e.g.*, *Butte Cnty. v. Hogen*, 613 F.3d 190, 194–95 (D.C. Cir. 2010) (An agency's explanation for its decision "must be one of

'reasoning,' it must not be just a 'conclusion.'" (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001))).

EPA's decision is also improper because it was impossible for Colorado to provide the assurances EPA claims were necessary. In its proposed rule, EPA claimed Colorado must provide assurances but did not explain how Colorado must do so. 90 Fed. Reg. at 31938. Then, when Colorado provided detailed assurances that there would not be a taking, EPA rejected the assurances without explaining why the assurances were inadequate or what Colorado should have done differently. App. at 02033 (EPA-R08-OAR-2024-0607-0069 at 8). It remains unclear in EPA's brief why Colorado's assurances were inadequate, as EPA simply reiterates that it need not defer to Colorado's assurances. EPA Br. at 37. EPA's creation of a necessary assurances requirement that Colorado could not meet is arbitrary and contrary to the Clean Air Act's cooperative federalism framework. *See New York v. EPA*, 964 F.3d 1214, 1222 (D.C. Cir. 2020) (rejecting an EPA test that "at best, was a moving target and, at worst, demanded likely unattainable standards of proof" from a state).

The entity that could actually present a takings claim related to Nixon is CSU. Notably, CSU does not claim that the SIP would result in a taking and it expressly takes no position on EPA's legal justification for disapproving the Nixon retirement deadline. CSU Br. at 14, 20 n.11. The fact that Nixon's owner has not raised any takings concerns and does not support EPA's legal position further underscores the unreasonableness of EPA's determination that Colorado did not provide necessary assurances regarding a potential taking.

### B. EPA's decision creates a loophole in the regional haze program

The Court should also set aside EPA's decision because it results in absurd consequences and opens a loophole in the regional haze program that will increase compliance costs and reduce flexibility for states to incorporate voluntary source closures into regional haze SIPs. Opening Br. at 57–61.

EPA dismisses this argument as a "parade of horribles" and claims that sources "do not make business decisions lightly" and "[t]here is no likelihood" that other sources will attempt to game the SIP process. EPA Br. at 38. The Court should reject these conclusory and unsupported post hoc statements. *Biodiversity Conservation*, 762

F.3d at 1060. Notably, an organization that coordinates regional haze work for several states and tribes—the Mid-Atlantic/Northeast Visibility Union—submitted comments raising concerns about how EPA's decision would hinder states from including voluntary retirements in SIPs and increase costs and create uncertainty for states. Opening Br. at 59–60 (discussing App. at 01387 (EPA-R08-OAR-2024-0607-0055 at 3)). EPA's brief ignores these comments, which demonstrate that NPCA and Sierra Club have not manufactured an unrealistic "parade of horribles." EPA Br. at 38.

Moreover, EPA's speculation that other sources will not attempt to reverse course on their previous retirement commitments is undercut by recent developments in other states where utilities have done just that. 91 Fed. Reg. 34589, 34592 (June 8, 2026) (Pacificorp withdrawing its consent to a Wyoming power plant retirement in March 2026); 91 Fed. Reg. 7204, 7217 & n.81 (Feb. 17, 2026) (Hawaiian Electric withdrawing its consent to power plant retirements in August 2025).

### C. EPA improperly based its disapproval solely on CSU's post hoc statements retracting its previous commitment to retire Nixon in 2029

EPA also improperly disapproved the SIP when the only factual basis for its disapproval was CSU's post hoc statements made years after Colorado submitted its SIP and after EPA's statutory deadline to act on the SIP had passed. Opening Br. at 46–49.

EPA and CSU attempt to reframe this argument on more favorable terms when they argue that EPA is not categorically barred from considering new facts that arise after a SIP submission. EPA Br. at 30–32, 35–36; CSU Br. at 15–17. But this is not NPCA and Sierra Club's argument. Instead, it was arbitrary in this case for EPA to disapprove Colorado's SIP based solely on CSU's self-interested post hoc statements seeking to avoid its compliance obligations. The only factual basis for EPA's disapproval was statements that CSU made long after Colorado submitted its SIP informing Colorado and EPA that it had changed its position on retiring Nixon in 2029. EPA blindly accepted these post hoc statements without conducting its own independent analysis of CSU's rationale for delaying the Nixon retirement. EPA

improperly allowed CSU to evade its emission reduction obligations in the SIP based only on these post hoc statements.

The nature of the post hoc information at issue here distinguishes this case from other cases involving new modeling or new emissions data. *See, e.g.*, *Sierra Club v. EPA*, 671 F.3d 955, 963–68 (9th Cir. 2012). As *Sierra Club* explains, SIPs must include accurate and current emissions data, and thus it may be reasonable in some cases for EPA to consider updated emissions data when it approves a SIP. *Id.* at 963. In contrast, the post hoc information here consists of CSU's statements retracting its previous commitment to retire Nixon by 2029. Unlike cases involving new modeling and emissions data, the post hoc information here is simply a source's self-interested statements seeking to avoid a compliance obligation it initially agreed to. It was arbitrary and inconsistent with the Clean Air Act's cooperative federalism framework for EPA to disapprove Colorado's SIP based only on these post hoc statements.

### D. EPA arbitrarily dismissed Colorado's reliance interest on EPA's 2019 Guidance

EPA also arbitrarily dismissed Colorado's reliance interest on EPA's 2019 guidance, which instructs states on how to incorporate

source closures into regional haze SIPs. Opening Br. at 53–57. EPA argues that the 2019 guidance "is inapposite here and has no bearing" because the guidance does not apply to unconsented closures. EPA Br. at 39. But when Colorado applied and relied on the 2019 guidance, the Nixon closure was not unconsented and the guidance was directly applicable. CSU's subsequent decision to withdraw its consent to the Nixon retirement does not negate Colorado's reliance interests in following EPA's 2019 guidance when it developed the SIP. *See, e.g., Kentucky v. EPA*, 123 F.4th 447, 471 (6th Cir. 2024) (EPA cannot advise a state one way when it develops a SIP and then deny the SIP "in large part because [the state] had done what the EPA told it to do").

### E. The Court should give no weight to statements suggesting the Nixon retirement would create grid reliability issues and Colorado should treat Nixon similar to the Comanche retirement

EPA and CSU claim that retiring Nixon in 2029 would create grid reliability issues. EPA Br. at 11–13, 34; CSU Br. at 6–11. EPA further argues that Colorado could have avoided these issues by removing the Nixon retirement from the SIP, similar to Colorado's action withdrawing the Comanche Unit 2 retirement deadline from the SIP. EPA Br. at 34. The Court should give no weight to these statements.

The only basis in this record for the purported grid reliability concerns are CSU's unverified and self-interested statements to Colorado and EPA. But commenters explained to EPA that CSU's assumptions are flawed in numerous ways, and EPA did not specifically respond to these comments. App. at 01435-1439 (EPA-R08-OAR-2024-0607-0058 at 33–37); App. at 02113-2120 (EPA-R08-OAR-2024-0607-0069 at 88–95). In its response to CSU, Colorado noted inaccuracies in CSU's statements and requested more data to "better understand" CSU's analysis and why CSU concluded "that almost all of the 200 submitted bids [to replace Nixon's generation] are not considered viable." App. at 01330 (EPA-R08-OAR-2024-0607-0030 at 3).

Additionally, there are several key distinctions between the Nixon and Comanche retirements. These distinctions undercut EPA's and CSU's statements about grid impacts and underscore how Colorado acted reasonably when it did not withdraw the 2029 Nixon retirement from the SIP at CSU's behest.

Comanche Unit 2 was scheduled to retire in December 2025, and Public Service Company of Colorado requested an extension of that retirement deadline in November 2025. App. at 02284 (EPA-R08-OAR-

2024-0607-0072 at 1). Nixon is scheduled to retire in December 2029, and CSU announced its desire to operate Nixon after that date in early 2025. 91 Fed. Reg. at 3052. The Comanche retirement was just one month away when Public Service proposed to extend that deadline, while the Nixon retirement was more than four years in the future when CSU stated that it wishes to extend Nixon's operations.

Additionally, Public Service requested a modest one-year extension of the 2025 Comanche retirement deadline. App. at 02284 (EPA-R08-OAR-2024-0607-0072 at 1). In contrast, CSU's statements discussed an indefinite extension of Nixon's 2029 retirement deadline. App. at 01313 (EPA-R08-OAR-2024-0607-0026 at 5).

Moreover, the Colorado Public Utilities Commission analyzed and approved the Comanche retirement extension, and multiple state agencies supported the one-year extension. App. at 02284 (EPA-R08-OAR-2024-0607-0072 at 1). No state agency analyzed and approved an extension of the Nixon retirement, and Colorado identified inaccuracies in CSU's letter and sought more data to analyze CSU's conclusions. App. at 01330 (EPA-R08-OAR-2024-0607-0030 at 3).

In sum, Comanche involves a one-year extension of an imminent 2025 retirement deadline, and multiple state agencies vetted, approved, and supported the extension. In contrast, Nixon involves a utility's unverified statements seeking to indefinitely extend a retirement deadline that would not occur until 2029, and Colorado raised issues with CSU's analysis and questioned the need to extend the deadline.

## IV. The Court should vacate EPA's rule

The Court should set aside and vacate EPA's rule because both vacatur factors support vacatur. First, EPA committed a serious error when it erroneously disapproved Colorado's entire SIP based on its claim that Colorado failed to provide necessary assurances for the Nixon retirement. Opening Br. at 62–65. Second, the disruptive consequences of vacatur are minimal, as none of the regulated sources other than CSU take issue with the SIP requirements. In contrast, remanding the rule without vacatur would create disruptive consequences because the two-year deadline for Colorado to submit a revised SIP or for EPA to issue a federal plan would remain in place. Colorado would therefore need to undertake a new SIP rulemaking

revisiting its entire SIP, despite the Court ruling that EPA's disapproval was unlawful. *Id.* at 65–67.

For the first factor, EPA makes a cursory claim that vacatur is not warranted because EPA "stands ready to provide greater explanation about its decision-making." EPA Br. at 41. But given these facts and this record, EPA could not provide a "greater explanation" on remand that would justify its decision to disapprove Colorado's entire SIP.

EPA claims the second factor is "at least neutral." *Id.* at 44–45. EPA points to a new May 2026 Colorado law, SB 26-182, that allows CSU to request an extension of the Nixon retirement to a date no later than December 31, 2032. *Id.* According to EPA, it could not approve the 2029 Nixon retirement deadline because of this new law if the Court vacates the rule. *Id.*

But regardless of this recent state law, the disruptive consequences here continue to favor vacatur. EPA again focuses only on the Nixon component of the SIP and glosses over the fact that Nixon is a small part of a much larger SIP that it disapproved. If the Court remands the rule without vacatur, Colorado would still face a two-year deadline to complete a rulemaking to revisit the 70+ emission limits in

the SIP, the retirement deadlines for the other power plants, and every other SIP element. And again, no entity objects to those SIP elements. Thus, remanding without vacatur would be disruptive, while it would not be disruptive to vacate the rule.

EPA also incorrectly assumes that SB 26-182 codified a 2032 retirement for Nixon. Instead, the legislation created a pathway for CSU and Colorado to extend the 2029 retirement deadline. The law states that a municipally owned utility, such as CSU, may submit an updated clean energy plan to Colorado by December 31, 2026. Colo Rev. Stat. § 25-7-105(1)(e)(VIII.5)(I). The updated plan must meet several statutory criteria, and Colorado must analyze and verify the plan. *Id.* § 25-7-105(1)(e)(XI.1), (1)(e)(XI.2). Neither EPA's nor CSU's brief indicate that CSU has developed and submitted an updated plan. Until CSU submits an updated plan with a later Nixon retirement deadline and until Colorado completes its analysis and verification process, the 2029 retirement deadline remains. Accordingly, SB 26-182 does not prevent EPA from approving the 2029 Nixon retirement deadline on remand. Moreover, EPA's assumption that the Nixon retirement will be

extended to 2032 is speculative and contingent on the outcome of future events.

CSU takes no position on this vacatur issue, but it asks the Court to clarify that on remand EPA must consider SB 26-182 and that this law prevents Colorado from providing necessary assurances for the 2029 Nixon retirement. CSU Br. at 3, 17, 19–23. Notably, CSU does not oppose vacatur, and its arguments are irrelevant to whether vacatur is warranted. And because the new legislation alone does not change the current 2029 Nixon retirement and contemplates a future state decision-making process, the Court should not issue an advisory opinion on an issue that is not ripe and that depends on the outcome of future events.

## CONCLUSION

The Court should hold unlawful and vacate EPA's disapproval of Colorado's regional haze SIP.

Dated September 25, 2026.

*s/ Michael Hiatt*
Michael Hiatt
Ameya Gehi
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
(303) 623-9466

mhiatt@earthjustice.org
agehi@earthjustice.org

*Attorneys for Petitioners National Parks Conservation Association and Sierra Club*

Matthew Gerhart
Sierra Club
1536 Wynkoop St., Suite 200
Denver, CO 80202
(303) 454-3346
matt.gerhart@sierraclub.org

*Attorney for Petitioner Sierra Club*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(A)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 6,415 words, or

[ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point font size and Century Schoolbook style, or

[ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Dated: September 25, 2026.

*s/ Michael Hiatt*

Michael Hiatt
Ameya Gehi
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
(303) 623-9466
mhiatt@earthjustice.org
agehi@earthjustice.org

*Attorneys for Petitioners National Parks Conservation Association and Sierra Club*

Matthew Gerhart
Sierra Club
1536 Wynkoop St., Suite 200
Denver, CO 80202
(303) 454-3346
matt.gerhart@sierraclub.org

*Attorney for Petitioner Sierra Club*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Power Shell Antivirus, AntiSpyware Signature Version 1.459.389.0, as of September 24, 2026, and according to the program are free of viruses.

*s/ Michael Hiatt*
Michael Hiatt

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2026, I served the foregoing **Petitioners National Parks Conservation Association and Sierra Club's Final Reply Brief (Deferred Appendix Proceeding)** with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*s/ Michael Hiatt*
Michael Hiatt